UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AVOCENT HUNTSVILLE, LLC,

          Plaintiff,

    v.

ZPE SYSTEMS, INC.,

          Defendant.

Case No. 3:17-cv-04319-WHO

**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION AND DENYING MOTIONS TO DISMISS**

Re: Dkt. No. 16, 17, 21, 31, 36, 51

## INTRODUCTION

Plaintiff Avocent Huntsville LLC ("Avocent") brings this patent infringement action against ZPE Systems, Inc. ("ZPE"), alleging that ZPE's products infringe two of Avocent's patents that both disclose a "System and Method for Consolidating, Securing and Automating Out-of-Band Access to Nodes in a Data Network." After losing two significant contracts to ZPE, Avocent moved to preliminarily enjoin ZPE from selling its NodeGrid Serial Console™ products. ZPE subsequently moved to dismiss Avocent's complaint on grounds that the patents claim ineligible subject matter under 35 U.S.C. § 101, and the allegations fail to state claims for both direct and indirect infringement.

Because the patents are tied to concrete structures and directed towards a specific improvement in the way computer-based systems operate, ZPE's motion to dismiss under section 101 is DENIED. Avocent's motion for preliminary injunction is DENIED because it has failed to demonstrate that it is likely to succeed on the merits and failed to establish the requisite causal nexus between its alleged irreparable injury. ZPE's motion to dismiss Avocent's infringement allegations is GRANTED IN PART AND DENIED IN PART. Avocent's contributory infringement allegations are DISMISSED WITHOUT LEAVE TO AMEND.

# BACKGROUND

## I. PROCEDURAL HISTORY

On July 28, 2017, Avocent Huntsville LLC ("Avocent") brought this action against ZPE Systems, Inc. ("ZPE") alleging ZPE's products, including the NodeGrid Serial Console[TM], infringe two of Avocent's patents, U.S. Patent Nos. 7,853,682 ("the '682 Patent"), and 7,478,152 ("the '152 Patent"), both titled "System and Method for Consolidating, Securing and Automating Out-of-Band Access to Nodes in a Data Network."[1] Compl. ¶¶ 8–10 (Dkt. No. 1); *see also* First Am. Compl. ¶¶ 8–10 ("FAC")(Dkt. No. 41); '682 Patent (Dkt. Nos. 41-1); '152 Patent (Dkt. No. 41-2).[2]

On August 21, 2017, Avocent moved to preliminarily enjoin ZPE from selling its NodeGrid Serial Console products. Mot. for Preliminary Injunction ("PI Mot.")(Dkt. No. 17). Just over a month later, ZPE moved to dismiss Avocent's complaint on the grounds that the infringement allegations failed to state a claim for relief, and the patents are directed to patent ineligible subject matter under 35 U.S.C. § 101. Mot. to Dismiss ("MTD")(Dkt. No. 36). Before ZPE's reply was due on its motion to dismiss, Avocent filed an amended complaint. First Am. Compl. ("FAC")(Dkt. No. 41). In ZPE's Reply, it indicated that its section 101 arguments remained ripe for review, but it would address Avocent's revised infringement allegations in a subsequent motion to dismiss. Reply to MTD (Dkt. No. 42).

On November 7, 2017, ZPE moved to dismiss Avocent's FAC. Mot. to Dismiss Avocent's FAC ("MTD FAC")(Dkt. No. 51). On November 8, 2017, I heard argument on the preliminary injunction motion and the section 101 arguments of ZPE's first motion to dismiss. 11/8/17 Minute Entry (Dkt. No. 52); 11/8/17 Hr'g Tr. (Dkt. No. 58). On January 24, 2018, I heard argument on

---

[1] The asserted patents share a common specification.

[2] After the briefing on Avocent's motion for preliminary injunction and in the midst of briefing on ZPE's motion to dismiss, Avocent filed an amended complaint. FAC (Dkt. No. 41). In reply to its motion to dismiss, ZPE asserted that the amendments only impact the portions of its motion pertaining to the infringement allegations, but that the validity of the patent claims under 35 U.S.C. § 101 remained an issue ripe for adjudication. It subsequently filed a motion to dismiss the FAC. Because this order addresses both motions to dismiss, I will hereafter reference allegations from the FAC, since it is the operative complaint.

1    ZPE's second motion to dismiss.  1/24/18 Minute Entry (Dkt. No. 61); 1/24/18 Hr'g Tr. (Dkt. No.

2    71).

3    **II.    FACTUAL BACKGROUND**

4        **A.    The Parties**

5        Avocent's Vice President and General Manager of Information Technology ("IT")

6    Management attests that Avocent is "the largest supplier of serial console servers in the market."

7    Corrected Wirts Decl. ¶ 4 (Dkt. No. 21-3[under seal]; Dkt. No. 21-4[redacted]).[3]  Its customers

8    have included Facebook, Dell, Google, Deutsche Telekom, Apple and Juniper Networks.  *Id*.

9    Prior to 2016, it reportedly controlled approximately 50 percent of the market.  *Id*. ¶ 8.

10       In 2009, Avocent was acquired by Emerson Electric Co., and Avocent became an entity

11   within Emerson Network Power.  Zimmerman Decl. ¶ 7 (Dkt. No. 31-6[under seal]; Dkt. No. 31-

12   5[redacted]).[4]  Emerson reportedly struggled with its integration of Avocent, repeatedly tried to

13   sell its Network Power division, and began laying off employees within that division.  *Id*. ¶ 8.

14       In 2013, two prior Avocent employees, Arnaldo Zimmermann and Livio Ceci,[5] formed

15   ZPE, which sells competitive information technology products, including out-of-band console

16

17   [3] Avocent filed an administrative motion to seal portions of the Declaration of Jay Wirts ("Wirts
     Decl."), Dkt. No. 16, and an administrative motion to seal portions of the Corrected Declaration of
18   Jay Wirts ("Corrected Wirts Decl."), Dkt. No. 21.  Avocent narrowly tailored its request for
     sealing to cover only highly confidential commercial information, including sales, product, and
19   pricing data, that could harm Avocent if the information was made publicly available to its
     competitors.  *See* Sloss Decl. ISO Administrative Mot. ¶¶ 4–6 (Dkt. No. 21-1); Berquist Decl. ISO
20   Administrative Mot. ¶¶ 4–6 (Dkt. No. 16-1).  Avocent has a "significant interest" in protecting its
     confidential, product-specific financial information.  *Apple Inc. v. Samsung Elecs. Co.*, 727 F.3d
21   1214, 1225 (Fed. Cir. 2013); *see also Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1179
     (9th Cir. 2006).  Because it has established good cause for sealing its narrowly tailored request, its
22   administrative motions (Dkt. Nos. 16, 21) are GRANTED.

23   [4] ZPE filed an administrative motion to seal portions of the Declaration of Arnaldo Zimmerman
     ("Zimmerman Decl."), and portions of its opposition to Avocent's motion for preliminary
24   injunction.  Dkt. No. 31.  It narrowly tailored its request for sealing to cover only its confidential
     financial and commercial information related to communications between ZPE and its customers
25   and potential customers.  Whitman Decl. ¶ 3.  ZPE has a "significant interest" in protecting its
     confidential, product-specific financial information.  *Apple Inc. v. Samsung Elecs. Co.*, 727 F.3d
26   1214, 1225 (Fed. Cir. 2013); *see also Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1179
     (9th Cir. 2006).  Because it has established good cause for sealing its narrowly tailored request, its
27   administrative motion (Dkt. No. 31) is GRANTED.

28   [5] Zimmerman and Ceci have worked together for "decades, starting long before [their] work[] at
     Avocent."  Zimmerman Decl. ¶ 3.

3

switches.  Corrected Wirts Decl. ¶ 6.  ZPE stands for "zero point energy," because one of the company's founding goals is to provide products that do not require their customers to exert time or energy adopting.  Zimmerman Decl. ¶ 11.  Another goal was to create high security products that are capable of integrating with other brands, preventing what is known as "vendor lock-in."  *Id*. ¶ 12.

At least six former Avocent employees are counted amount ZPE's leadership.  Corrected Wirts Decl. ¶ 6; *see also* ZPE website "Leadership" page (Berquist Decl., Ex. 3; Dkt. No. 17-9).  According to ZPE, employees left Avocent due to job instability within Emerson's Network Power division.  Zimmerman Decl. ¶¶ 8, 17.  Avocent's Vice President declares that these six individuals "have intimate knowledge of Avocent ACS products, the features of those products, their profit margins, the serial console server market, and Avocent's customers and their product preference and requirements."  Corrected Wirts Decl. ¶ 6.

In 2016, Emerson sold its Network Power division to an investment group, the new company was named Vertiv™.  Zimmerman Decl. ¶ 9.  Avocent subsequently closed its California facilities.  *Id*. ¶¶ 10, 16.

## B.  The Products

Avocent alleges that the NodeGrid Serial Console™ competes directly with its ACS Console Switch products, which "enable IT managers to access and control computers on a network, including those connected to the network over internet connections."  FAC ¶ 1; *see also* Corrected Wirts Decl. ¶ 3.  The background section of the patents provides,

> Data center management professionals commonly use network management tools for monitoring and restoring the operation of network nodes such as computer servers, network appliances, security appliances, storage devices, sensors, and controls. These typical network management tools permits the professional to manage and restore the operations of the network nodes remotely. Typically, these network management tools are divided in two categories: in-band management tools and out-of-band management tools. An in-band management tool relies on the data network connected to the network nodes to transport the management information. An out-of-band management tool creates an alternative path to communicate with the network nodes using alternative hard ware means such as dial up phone lines or separate networks that are used exclusively for management. The out-of-band management tool permits the supervisor to access the managed network nodes

even when the network nodes lose network connectivity.

'682 patent at 1:24–41 (Dkt. No. 41-1); '152 patent at 1:16–33 (Dkt. No. 41-2). And the summary describes the invention as "a single common aggregation point for a plurality of out-of-band interfaces, offering consolidation close to the managed devices that avoids the transport of disparate data streams across the corporate and public networks." '682 patent at 2:62–66; '152 patent at 2:54–58.

The '682 patent was issued on December 14, 2010 (FAC ¶ 19) and the '152 Patent was issued on January 13, 2009 (FAC ¶ 46). Avocent owns by assignment all rights to the patents. FAC ¶¶ 19, 46. It alleges that ZPE willfully infringes, both directly and indirectly, claim 1 of the '682 patent and claims 1 and 11 of the '152 patent through a group of out-of-band management products collectively referred to as the NodeGrid-brand products. Counts I and IV (direct infringement)(FAC ¶¶ 18–26; FAC ¶¶ 45–54); Counts II and V (indirect infringement, induced)(FAC ¶¶ 27–35; FAC ¶¶ 55–63); Counts III and VI (indirect infringement, contributory)(FAC ¶¶ 36–44; FAC ¶¶ 64–72).

Claim 1 of the '682 patent describes the claimed invention as:

> An out-of-band network management apparatus for devices on a computer network employing data transmission interfaces for the devices to communicate substantive data on the network, the devices also having management systems to communicate management data associated with the devices, the management data being different from the substantive data, the apparatus comprising:
> a plurality of network nodes on the computer network manageable through a dedicated management interface other than through the data transmission interfaces wherein the plurality of network nodes use at least a plurality of different types of management interfaces that communicate a plurality of different types of the management data over the dedicated management inter face and not over the data transmission interfaces;
> a management application executing on a computer system that receives the plurality of different types of the management data, converts the plurality of different types of management data into a common management data format and communicates that common management data format to a network management system; and
> a web server application executing on the computer system that generates a graphical user interface based on the common management data format and a web-browser that permits a user to access each of the devices through the same management application using the common management data format, wherein the management application monitors and accesses said devices remotely to restore network connectivity when a network node

5

of the plurality of network nodes fails.

'682 patent at 15:10–39; *see also* '152 patent at 15:7–44 (replacing "management module" for "management application"). Avocent alleges that ZPE's NodeGrid-brand products include a "management module" or "management application" that receives and converts different type of management data from a group of network devices or "nodes" (e.g., routers, firewalls, PDUs, etc.) into a common management data format to generate a graphical interface remotely accessible by users, thereby infringing the out-of-band system claimed in Avocent's asserted patents. FAC ¶¶ 20, 47.

## C.     The Business

Avocent states that "[i]t is not clear precisely when the ZPE NodeGrid Serial Console products became available for purchase, but [it] is not aware of having lost any sales to the ZPE NodeGrid Serial Console until late 2016, and early 2017."[6] Corrected Wirts Decl. ¶ 7. In late 2016, Avocent lost the Facebook account, which was worth ███████. *Id.* ¶ 11. ZPE won the account using its NodeGrid Serial Console product. *Id.* ¶¶ 11, 13; *see also* Zimmerman Decl. ¶ 24. Facebook made clear that it was only interested in products that had the out-of-band management capability.[7] Corrected Wirts Decl. ¶ 12.

Avocent and ZPE also competed for the sale of serial console servers to Visa, Inc. ("Visa"). Corrected Wirts Decl. ¶ 14. In bidding for the Visa contract, Avocent reduced its

---

[6] ZPE clarifies that it introduced the Nodegrid Serial Console in March 2015. Zimmerman Decl. ¶ 18. Zimmerman indicates that Avocent reached out to him to schedule a meeting to discuss ZPE's products and capabilities. *Id.* ¶ 19. The parties, including ZPE's Zimmerman and Avocent's Wirts, participated in a teleconference on April 17, 2015. *Id.* According to Zimmerman, Wirts asked if ZPE was interested in offering the Nodegrid Serial Console™ product as original equipment manufacturing ("OEM") to Avocent. *Id.* Zimmerman purportedly indicated that ZPE was not interested because it was "already working with key potential customers, in particular Google." *Id.* According to ZPE, Avocent learned at this time that ZPE was discussing the Nodegrid Serial Console with Google. *Id.* It never mentioned "any purported intellectual property, or that it considered any ZPE product to infringe on any purported Avocent technology." *Id.* ¶ 21. Avocent contests the accuracy of Zimmerman's representations. *See* Reply ISO PI at 1; Supp. Wirts Decl. ¶¶ 2–5. According to Wirts, Avocent did not ask ZPE to consider supplying its NodeGrid Serial Console product on an OEM basis. Supp. Wirts Decl. ¶ 5. To the contrary, Avocent lacked sufficient information about the product, and therefore "was in no position to suggest out-sourcing production of that product from ZPE." *Id.*; *see infra* discussion on irreparable harm.

[7] ZPE received feedback from Facebook identifying the various reasons it selected ZPE's Nodegrid Serial Console™ product. Zimmerman Decl. ¶ 24 (Dkt. No. 31-6[under seal]).

proposed contract price from ████████████████████.  *Id.* ¶ 15.  Avocent still lost the contract.

*Id.* ¶ 16.  ZPE purportedly won the sale because its product "provided requisite features that no

one else did."  Zimmerman Decl. ¶ 26.  Avocent is currently competing with ZPE for contracts

with Google, Inc. and Deutsche Telekom AG, *id.* ¶28; *see also* Corrected Wirts Decl. ¶ 17, as well

as Apple, Inc. and Juniper Networks, Inc., *id.* ¶ 23.

     ZPE's Ceci and Zimmerman worked for two years developing "a new concept in the

market, called Software Defined Infrastructure (SDI)."  Zimmerman Decl. ¶ 15.  They used this

idea to create the NodeGrid hardware and software, and they currently have several patents

pending.  *Id.*  The Nodegrid Serial Console$^{TM}$ is "highly powerful, fast, secure, [] based on an

open frame platform, is vendor-neutral, supports high density port count (first to have 96 ports in

one unit), is highly customizable by ZPE or the customer itself, and employs Zero Touch

Provisioning."  *Id.* ¶ 18; *see also* NodeGrid Serial Console brochure (Berquist Decl. ¶ 7, Ex. 6;

Dkt. No. 17-12).  It "runs an Intel-brand central processing unit and functions like a server running

a Linux operating system."  Zimmerman Decl. ¶ 18.  ████████████████████████

████████████████████  *Id.* ¶ 31.

## LEGAL STANDARD

### I.     MOTION TO DISMISS

     Under Federal Rule of Procedure 12(b)(6), a district court must dismiss a complaint if it

fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to

dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its

face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when

the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant

is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation

omitted).  While courts do not require "heightened fact pleading of specifics," a plaintiff must

allege facts sufficient to "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at

555, 570.  In deciding whether the plaintiff has stated a claim upon which relief can be granted,

the court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of

the plaintiff.  *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  The court is

United States District Court
Northern District of California

not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

To state a claim for patent infringement, "a patentee need only plead facts sufficient to place the alleged infringer on notice. This requirement ensures that the accused infringer has sufficient knowledge of the facts alleged to enable it to answer the complaint and defend itself." *Phonometrics, Inc. v. Hosp. Franchise Sys., Inc.*, 203 F.3d 790, 794 (Fed. Cir. 2000). The Federal Circuit has "repeatedly recognized that in many cases it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion." *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1269, 1373 (Fed. Cir. 2016). In such circumstances where it is possible and proper, "claim construction is not an inviolable prerequisite to a validity determination under § 101." *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can.*, 687 F.3d 1266, 1273 (Fed. Cir. 2012).

## II. PRELIMINARY INJUNCTION

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "These factors, taken individually, are not dispositive; rather, the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested." *Hybritech, Inc. v. Abbott Labs.,* 849 F.2d 1446, 1451 (Fed. Cir. 1988).

"The grant or denial of a preliminary injunction … is within the sound discretion of the district court." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001).

## DISCUSSION

## I. PATENT ELIGIBLE SUBJECT MATTER UNDER 35 U.S.C. § 101

### A. Principles

Under Section 101 of the Patent Act, "[w]hoever invents or discovers any new and useful

process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor . . . ." 35 U.S.C. § 101. The Supreme Court "has long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014). The reason for the exception is clear enough—"such discoveries are manifestations of . . . nature, free to all men and reserved exclusively to none." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012) (internal quotation marks and citations omitted). The boundaries of the exception, however, are not so clear.

The *Alice* court highlighted "the concern that drives this exclusionary principle as one of pre-emption." *Alice*, 134 S. Ct. at 2354 (noting the delicate balance inherent in promoting progress, the primary object of patent law, and granting a monopoly, the means for accomplishing that goal). In other words, patents that seek to wholly preempt others from using a law of nature or an abstract idea—"the basic tools of scientific and technological work"—are invalid. *Id.* "Accordingly, in applying the § 101 exception, we must distinguish between patents that claim the buildin[g] block[s] of human ingenuity and those that integrate the building blocks into something more, thereby transform[ing] them into a patent-eligible invention." *Id.* (internal quotation marks and citations omitted).

In evaluating whether claims are patent eligible, I must first "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Alice*, 134 S. Ct. at 2355. "[T]he 'directed to' inquiry applies a stage-one filter to claims, considered in light of the specification, based on whether their character as a whole is directed to excluded subject matter." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016) (internal quotation marks omitted). Although there is no brightline rule for determining whether a claim is directed to an abstract idea, courts have articulated some guiding principles. When evaluating computer-related claims, courts look to whether the claims "improve the functioning of the computer itself," *Alice*, 134 S. Ct. at 2359, or whether "computers are invoked merely as a tool" to implement an abstract process. *Enfish*, 822 F.3d at 1336.

If the claims are directed to a patent-ineligible concept, I must then "consider the elements

9

of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Id.* at 1334 (internal quotation marks and citations omitted). This step entails the "search for an inventive concept— *i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 134 S. Ct. at 2355 (internal quotation marks and citations omitted). "For the role of a computer in a computer-implemented invention to be deemed meaningful in the context of this analysis, it must involve more than performance of well-understood, routine, [and] conventional activities previously known to the industry." *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1347–48 (Fed. Cir. 2014). "[T]he mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id.* at 1348. However, "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016).

### B. Application

#### 1. The Claims

The claimed invention is "[a]n out-of-band management system for devices on a computer network… ." '152 patent, claim 1 at 15:7–8. The system is comprised of "a plurality of network nodes manageable through a dedicated management interface other than through the data transmission interfaces" and "a management module, executing on a computer, that receives the plurality of different types of management data, converts the different types of management data into a common management data format, and communicates the common management data format to a network management system[.]" *Id*. at 15:23–29; *see also* '152 patent, claim 11 at 16:33–53; '682 patent, claim 1 at 15: 25–39.

#### 2. Whether the Claims are Directed to an Abstract Idea

ZPE argues that "[t]he asserted claims are directed to the abstract idea of converting different data types into a common data format for transmission over a network." MTD at 17. According to it, this data translation amounts to "taking existing information … and organizing

1   this information into a new form[,]" which the Federal Circuit has deemed patent ineligible in the

2   absence of limitations tying the claims to a specific structure or machine. *Id.*; *see, e.g.*, *Digitech*

3   *Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1350 (Fed. Cir. 2014)(finding

4   unpatentable a process of combining two data sets, when steps untethered to a specific structure or

5   machine).

6       Avocent insists that ZPE's analysis ignores post-*Alice* precedent, such as *Enfish, LLC v.*

7   *Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016), where the Federal Circuit found that claims

8   "directed to a specific improvement to the way computers operate" were not directed to an abstract

9   idea under the first step of *Alice*. *Id.* at 1336. It contends that ZPE approaches the claims at too

10  high a level of generality, which the *Enfish* court explicitly warned against. *See id.* at 1337

11  ("[D]escribing the claims at such a high level of abstraction and untethered from the language of

12  the claims all but ensures that the exceptions to § 101 swallow the rule."). I agree.

13      The claims do not simply use computers as a tool; rather, they are tied to specific

14  structures. *See* '152 patent, claim 1 at 15:23–38 (claiming a "management system for

15  devices…comprising: a plurality of network nodes… a management module…"); *id.*, claim 11 at

16  16:33–53 (claiming a "management method for devices); '682 patent, claim 1 at 15:10–39

17  (claiming an "apparatus for devices"). And the physical components do more than provide a

18  "generic environment in which to carry out [an] abstract idea[.]" *Cf. In re TLI Commc'ns LLC*

19  *Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016)(finding the claims were "directed to the use of

20  conventional or generic technology in a nascent but well-known environment, without any claim

21  that the invention reflects an inventive solution to any problem… ."); *Digitech Image Techs., LLC*

22  *v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014)(claiming "ineligible abstract

23  process of gathering and combining data" not tied to any particular structure). The claims are

24  directed to specific improvements in computer-related technology. The specifications teach how

25  the claims enhance conventional systems by converting different types of management data into a

26  common management data format, and communicating that common management data to a

27

28

11

network management system that enables remote monitoring and accessing of devices.[8] *See, e.g.*, '152 patent at 4:59–5:50. This improvement reduces the total amount of data communicated over the communications network and simplifies the system to a single secure point of access, thereby removing barriers to new technologies, including enhanced security. *See id.* at 5:57–62.

The Federal Circuit has repeatedly affirmed that claims directed towards improvements in computer-related systems are patent eligible. *See, e.g.*, *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1259 (Fed. Cir. 2017)(concluding that the claims were "directed to an improved computer memory system, not to the abstract idea of categorical data storage."); *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1301 (Fed. Cir. 2016)(explaining how the claim's "technological solution to a technological problem" entailed patent-eligible subject matter); *Enfish*, 822 F.3d at 1339 (finding that "the claims are directed to a specific implementation of a solution to a problem in the software arts" and therefore "not directed to an abstract idea.").

ZPE takes issue with the claims' purported failure to disclose *how* to perform the disclosed technological improvement. *See* MTD at 18 ("The asserted claims nowhere describe how to perform the recited receiving, converting and transmission of data. Instead, the asserted patents describe a collection of functionally-described 'black boxes,' connected over a data network using admittedly known data protocols. These black boxes provide a generic environment, composed of nonce modules, by which data consolidation and data translation somehow magically occurs without explanation."); *id.* at 22. But ZPE's attempts to liken this case to the claim in *Clarilogic, Inc. v. FormFree Holdings Corp.*, 681 F. App'x 950 (Fed. Cir. 2017) are unconvincing. In *Clarilogic*, the Federal Circuit held that "a method for collection, analysis, and generation of information reports, where the claims are not limited to how the collected information is analyzed or reformed, is the height of abstraction." *Id.* at 954. But as explained, the claims here do not merely "display[] certain results of the collection and analysis [of information,]" *Elec. Power*

---

[8] Despite ZPE's protestations, it is appropriate to "examine the claims in light of the written description" in performing this analysis. *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1299 (Fed. Cir. 2016); *see also Enfish*, 822 F.3d at 1335; *In re TLI Commc'ns*, 823 F.3d at 611–615. The claims themselves detail the structure of the system; the specification simply explains how the claimed invention improves the functioning of the conventional system.

*Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016); rather, they are tied to concrete structures, with the specific goal of improving the functioning of network management systems. These elements remove the claims from the realm of abstract ideas. ZPE's attacks on the "how" of the invention seem better suited for a challenge to validity based on lack of enablement under section 112, paragraph 1,[9] or indefiniteness under section 112, paragraph 6.

### 3. Whether the Claims Add an Inventive Concept

Even if I were to find that the claims were directed to an abstract idea under step one, they "entail an unconventional technological solution … to a technological problem[,]" thereby providing the inventive concept necessary for patent eligibility, even though they rely in part on generic components. *Amdocs*, 841 F.3d at 1300; *see id.* at 1302 ("Claim 1 involves some arguably conventional components (e.g., gatherers), but the claim also involves limitations that when considered individually and as an ordered combination recite an inventive concept through the system's distributed architecture."). Avocent argues that the claimed inventions provide two inventive concepts—the consolidation and conversion of the management data at a single "management application" or "management module," '152 patent, claim 1 at 15:23–29; *id.*, claim 11 at 16:33–42; '682 patent, claim 1 at 15:25–30, and localized automated alarm handling, '152 patent, claim 1 at 15:36–38; *id.*, claim 11 at 16:51–53; '682 patent, claim 1 at 15:36–39. This "management module" or "management application" is closer to the managed devices than the consolidation that takes place at a remote network management system in the conventional network, which yields certain benefits as articulated in the specification. '682 patent at 6:43–49.

Once again, ZPE underscores its view that the patents fail to explain *how* to accomplish the claimed invention. *See* MTD at 22; Reply at 7. As explained above, this argument is more appropriately addressed in a validity challenge rather than an attack on patent eligibility. It also insists that "localized automated alarm handling" is not a claim element; rather, the actual claim limitation reads "the management application monitors and accesses said devices remotely to

---

[9] Because the patent applications were filed before September 16, 2012, the pre-America Invents Act § 112 applies. Pub. L. No. 112-29, § 4(e), 125 Stat. 296 – 97 (2011); *see Knowles Elecs. LLC v. Cirrus Logic, Inc.*, ___ F.3d ___, 2018 WL 1095253, at *4 n.7 (Fed. Cir. Mar. 1, 2018).

restore network connectivity when a network node of the plurality of network nodes fails." '682 patent, claim 1; *see* MTD at 23; Reply at 7. But that claim language "viewed in light of the specification" discloses the "localized automated alarm handling" as described by Avocent. *See, e.g.*, '682 patent, figure 12 at 13:44–63 (illustrating an alarm handling screen of an exemplary out-of-band network management system in accordance with the invention); *id.*, figure 13 at 13:64–67 (illustrating an example of automated alarm handling method of an exemplary out-of-band network management system in accordance with the invention"); *id.* at 14:1–2 (explaining that "[t]he invention also allows for localized automated alarm handling" and contrasting to conventional systems where the operator would use a different application to access a device to resolve a problem). Thus, it is reasonable to infer that the claims disclose this technological improvement at this stage of the proceedings.

Having concluded that the patents claim eligible subject matter, I proceed to address Avocent's motion for a preliminary injunction.

## II.      PRELIMINARY INJUNCTION

### A.      Reasonable Likelihood of Success on the Merits

"In order to demonstrate a likelihood of success on the merits, [plaintiff] must show that, in light of the presumptions and burdens that will inhere at trial on the merits, (1) [plaintiff] will likely prove that [defendant] infringes the [patents-in-suit], and (2) [plaintiff's] infringement claim will likely withstand [defendant's] challenges to the validity and enforceability of the [patents-in-suit]." *Amazon.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001).

#### 1.      Infringement

"[I]nfringement analysis involves two steps: the claim scope is first determined, and then the properly construed claim is compared with the accused device to determine whether all of the claim limitations are present either literally or by a substantial equivalent." *Amazon.com, Inc.*, 239 F.3d at 1351.

Avocent relies on the declarations of its technical expert, Joseph C. McAlexander, III, to insist that "there is a strong likelihood that [it] will succeed in proving direct and indirect infringement of at least claims 1 and 11 of the '152 patent and claim 1 of the '682 patent." PI

Mot. at 9; see McAlexander Decl. (Dkt. No. 17-2). McAlexander reviewed the patents and found that the patentee did not define any claim terms, nor did he expressly disavow any claim scope, so he used the plain and ordinary meaning of the claim terms as understood by a person of ordinary skill in the art at the time of the inventions. McAlexander Decl. ¶ 12. He then developed claim charts comparing ZPE's Nodegrid Serial Console™ product to claims 1 and 11 of the '152 patent and claim 1 of the '682 patent. *Id.* ¶ 14; *see* '152 Patent Claim Chart Comparison (McAlexander Decl., Ex. B; Dkt. No. 17-4); '682 Patent Claim Chart Comparison (McAlexander Decl., Ex. C; Dkt. No. 17-5). And he concluded that each and every element of the claims is literally infringed by ZPE's Nodegrid Serial Console™ product. McAlexander Decl. ¶ 14; *see also* Supp. McAlexander Decl. ¶¶ 2–4 (Dkt. No. 34-1).

ZPE begins its attack by pointing out that Avocent has not alleged that ZPE "makes, uses, sells, or offers to sell the entire, claimed system" of the asserted patent claims. *See* Opp'n to PI at 9. ZPE contends that its NodeGrid products cannot possibly infringe Avocent's patents because they claim systems that require multiple, interconnected devices, including "devices on a computer network" that have "management systems," '152 patent at 15:7–10, "a plurality of network nodes" that "use at least a plurality of different types of management interfaces," *id.* at 15:14–18, and "a management module, executing on a computer," *id.* at 15:23. And the "management module further comprises … plural modules … and the network management system further comprises a web server application, executing on a computer[.]" *Id.* at 15:30–40; *see also* '152 patent, claim 11 at 16:25–30, 33, 40–42, 45, 53–58;'658 patent, claim 1 at 15:10–13, 17–22, 25 ("management application" instead of "management module"), 30–31.

In short, Avocent's patents claim a "system," but Avocent accuses ZPE of making only one component of that system—the "management module" or "management application." Liability for infringement requires a party to make, use, offer to sell, or sell the entire patented invention. 35 U.S.C. § 271(a); *see also BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1380 (Fed. Cir. 2007). In Reply, Avocent makes clear that ZPE's product is designed to be capable of managing a plurality of network nodes or "connected devices," which it presumably tested during development, thereby infringing the "network management system" under claim 1 of the '152

15

patent, the "network management apparatus" under claim 1 of the '682 patent, and the method claim 11 of the '152 patent. Reply ISO PI at 4 (Dkt. No. 34); Supp. McAlexander Decl. ¶¶ 2–4; *see, e.g.*, FAC ¶ 20 ("[E]ach of the NodeGrid-brand products [which are out-of-band management products] communicate with a group of network devices (e.g., routers, firewalls, PDUs, etc.) (i.e., the claimed 'network nodes'), where at least two of the group of network devices communicate through a dedicated management interface (e.g., a serial port or a set of KVM ports) using multiple types of management interfaces (e.g., IPMI, iLO, UPS, RS-232) to communicate multiple types of management data (e.g., KVM, command line, etc.) to the NodeGrid-brand products using an out-of-band management interface, not a substantive data transmission interface (e.g., a substantive data Ethernet-LAN interface)."). And it highlights ZPE's own product literature touting this capability. *See* '152 Patent Claim Chart Comparison at 2 (relying on ZPE's Nodegrid Serial Console Presentation). At this stage, Avocent's allegations are sufficient to dodge ZPE's attack on Avocent's direct infringement claims.[10]

I find more merit in ZPE's objection to Avocent's failure to provide proposed constructions to any claim terms. ZPE raises two issues that convince me that claim construction is a necessary predicate to any infringement analysis—the presence of "nonce terms" that require construction (and may lack sufficiently definite structure, *see infra* discussion on validity) and clear disavowal in the claim language. Opp'n to PI at 10–13. ZPE argues that many of the terms (e.g., system, devices, network, nodes, module) are "nonce terms" that require construction. Opp'n to PI at 11. According to the Federal Circuit, these "nonce words" are "tantamount to using the word 'means' because they typically do not connote sufficiently definite structure and therefore may invoke § 112, para. 6." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1350 (Fed. Cir. 2015)(internal quotation marks omitted). Avocent correctly points out that *Williamson* employed permissive modifiers such as "typically," "can," and "may," which indicate that the use of "nonce" words such as "module" does not *necessarily* trigger the means-plus-function analysis

---

[10] A more thorough analysis of ZPE's challenges to Avocent's infringement allegations is discussed in the context of ZPE's motion to dismiss Avocent's First Amended Complaint. *See infra* discussion section III.

under section 112, paragraph 6. *See* Reply ISO PI at 6. But in explaining the structural nature of terms such as "management module," Avocent relies on the specification's description. *Id*. at 7 (citing '152 patent at 6:28–30; *id*. at 7:18–11:49; *id*. at 13:54–14:65). This argument seems to concede that these claim terms require construction. Without a proposed construction, I cannot ascertain the scope of the claimed invention. Without knowing the scope, I cannot determine whether all of the claim limitations are present in the accused product.

### 2. Validity

"[A] patent enjoys the same presumption of validity during preliminary injunction proceedings as at other stages of litigation." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009). If an alleged infringer attacks the validity of the patent, "the burden is on the challenger to come forward with evidence of invalidity[.]" *Id*. "If the trial court determines that the challenger's evidence is sufficient to raise 'a substantial question' of invalidity, the trial court must then afford the patentee the opportunity to show that the invalidity defense 'lacks substantial merit.'" *Id*. at 1378. Once the trial court "weigh[s] the evidence both for and against validity that is available at this preliminary stage" then it must determine whether "the alleged infringer has presented an invalidity defense that the patentee has not shown lacks substantial merit[.]" *Id*. at 1379. If it has, "it necessarily follows that the patentee has not succeeded in showing it is likely to succeed at trial on the merits of the validity issue." *Id*.

In its motion, Avocent relies on the presumption of validity while ZPE urges that the patents are indefinite and invalid under 35 U.S.C. § 112(b). PI Mot. at 12; Opp'n to PI at 14–24. ZPE launches three attacks on the patents' validity: it claims they are indefinite under section 112, paragraph 6; anticipated by prior art under 35 U.S.C. § 102(b); and ineligible under 35 U.S.C. § 101. Opp'n to PI at 14–24. I already addressed the eligibility of the patent's subject matter. *See supra* discussion section I. I now address the remaining two validity issues.

### a. Whether the Patents are Likely to Be Found Indefinite

As mentioned above, the parties disagree whether certain claim terms, including "management module" and "management application," are subject to means-plus-function limitations under 35 U.S.C. section 112, paragraph 6. ZPE relies on *Williamson v. Citrix Online*

to insist that these terms invoke means-plus-function analysis, that the specification fails to disclose sufficient structure, and the patents are therefore indefinite.

In *Williamson*, the Federal Circuit noted that assessing "whether the limitation in question is a means-plus-function term subject to the strictures of § 112, para. 6, our cases have emphasized that the essential inquiry is not merely the presence or absence of the word 'means' but whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." 792 F.3d at 1348. The Federal Circuit affirmed the district court's finding that the claim's use of the nonce word "module" was "tantamount to using the word 'means'" as "a generic description for software or hardware that performs a specified function." *Id*. at 1350. It specifically noted,

> While portions of the claim do describe certain inputs and outputs at a very high level (e.g., communications between the presenter and audience member computer systems), the claim does not describe how the "distributed learning control module" interacts with other components in the distributed learning control server in a way that might inform the structural character of the limitation-in-question or otherwise impart structure to the "distributed learning control module" as recited in the claim.

*Id*. at 1351. The court also found Williamson's technical expert's declaration unpersuasive because "the fact that one of skill in the art could program a computer to perform the recited functions cannot create structure where none otherwise is disclosed." *Id*. Having found that the claim failed to include "sufficiently definite structure and that the presumption against means-plus-function claiming [was] rebutted[,]" it proceeded to apply section 112, paragraph 6, and concluded that the claim was indefinite because the specification also failed to disclose sufficient structure corresponding to the claimed function. *Id*. at 1351–1354.

ZPE urges that *Williamson* is "directly on point" and argues that the five functions claimed in the '152 patent's "management module" and the '682 patent's "management application" lack sufficient structure to save them from an indefiniteness attack. Opp'n to PI at 15–16. ZPE has at least "raise[d] 'a substantial question' of invalidity[.]" *Titan Tire*, 566 F.3d at 1377. It identifies five functions recited in the claims:

> A management module, executing on a computer, that [1] receives the plurality of different types of management data, [2] converts the

18

United States District Court
Northern District of California

> different types of management data into a common management data format, and [3] communicates the common management data format to a network management system … the management module [4] monitors and [5] accesses said devices remotely to restore network connectivity when a network fails.

'152 patent, claim 1 at 15:23–38; *see also id.*, claim 11 at 16:33–53 (disclosing a method for "receiving," "converting," communicating," "monitoring," and "accessing"); '682 patent, claim 1 at 15:25–37 (replacing the '152 patent's "module" with "application"). As in *Williamson*, the claims use "module" to describe any software "executing on a computer" that performs the five recited functions.

Avocent counters this assertion by highlighting its expert's contention that "[t]he various claim terms … are all well-known structural components used in computer network management systems, and are explicitly identified throughout the asserted patent specifications[,]" Supp. McAlexander Decl. ¶ 5, and ZPE's expert's adoption of this understanding, *see* Souri Decl. ¶ 31 (Dkt. No. 32-22); Reply ISO PI at 6–7. It then proceeds to reference the specification for the requisite structure and algorithms. *See id.* ¶ 6. By focusing on the specification, Avocent's position appears to accept that the terms are subject to means-plus-function analysis under section 112, paragraph 6.

Once a term is deemed subject to means-plus-function analysis, the court "determine[s] whether the specification discloses sufficient structure that corresponds to the claimed function." *Williamson*, 792 F.3d at 1351. First, I must identify the claimed function, and then I look to the specification for structure corresponding to each identified function. *See id.* I agree with ZPE's assessment of the five claimed functions of the "management module/application": (1) receiving different types of management data, (2) converting that data into a common management data format, (3) communicating that common management data to a network management system, (4) monitoring the devices, and (5) accessing the devices remotely to restore network connectivity upon failure.

Avocent cites the common specification and its technical expert's declarations that the "term [management module] refers to well-known products within the art … including [the specification's] reference to the Alterpath Manager sold by Cyclades Corporation." Supp.

McAlexander Decl. ¶ 6; *see* Reply ISO PI at 7. Its expert further attests that

> [O]ne of ordinary skill in the art would clearly recognize that Figures 4 and 13 of the asserted patents disclose structure and algorithms including algorithms for the management module's aggregation function whereby the claimed system is capable of managing a plurality of nodes having different interfaces and the monitoring, detection, power cycling and reboot functions associated with the claimed feature of restoring network connectivity when a network node fails.

McAlexander Decl. ¶ 6. It also highlights the fact that ZPE's expert relies on a prior art reference that identifies structures as "management appliances," indicating that the prefix "management" adequately delineates a specific class of structures known in the art. Reply ISO PI at 7–8; Article entitled "CommandCenter Single Point of Administration for Remote Management," published by Arula Systems (Whitman Decl. ¶ 10; *id*., Ex. 9; Dkt. No. 32-10); U.S. Patent No. 8,176,155, entitled "Remote System Management" (Whitman Decl. ¶ 12; *id*., Ex. 11; Dkt. No. 32-12); "Remote System Management" presentation (Whitman Decl. ¶ 13; *id*., Ex. 12; Dkt. No. 32-13); *see infra* discussion II.A.2.b (addressing ZPE's anticipation defense).

At this stage, I cannot definitively say that the specification discloses adequate structure corresponding to each claimed function. *See Williamson*, 792 F.3d at 1352. But Avocent has at least demonstrated on this record that ZPE's indefiniteness defense "lacks substantial merit." *See Titan Tire*, 566 F.3d at 1378.

### b. Whether the Patents Are Likely Anticipated By Prior Art

Next, ZPE insists that the prior art Raritan Inc. CommandCenter[TM] "aggregator appliance" fully anticipates Avocent's claims under 35 U.S.C. § 102(b). Opp'n to PI at 18. "If the claimed invention was 'described in a printed publication' either before the date of invention, 35 U.S.C. § 102(a), or more than one year before the U.S. patent application was filed, 35 U.S.C. § 102(b), then that prior art anticipates the patent." *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1334 (Fed. Cir. 2008). "[T]he anticipation inquiry proceeds on a claim-by-claim basis." *Id.*

According to ZPE, Raritan's CommandCenter[TM] has been on sale since 2001, was considered a "pioneer[ing] product[]" in out-of-band and in-band collaboration, and has beaten Avocent's products in competition "as far back as 2005." Opp'n to PI at 18; *see* Article entitled

"CommandCenter Single Point of Administration for Remote Management," published by Arula Systems (Whitman Decl. ¶ 10; *id*., Ex. 9; Dkt. No. 32-10); Article entitled "Experian Centrally Manages Servers Holding British-Based Business Intelligence," published by Raritan (Whitman Decl. ¶ 19; id., Ex. 18; Dkt. No. 32-19)("We found that Raritan offered us better security, centralized management and scalability than the Avocent DS Series."); Executive Summary Enterprise Management Associates' Research Report entitled "Out-of-Band Management: Marketplace Assessment," prepared for Uplogix (Whitman Decl. ¶ 20; *id*., Ex. 19; Dkt. No. 32-20). ZPE indicates that Avocent failed to disclose these prior art publications during patent prosecution. Opp'n to PI at 18. Its expert took Avocent's infringement charts and inserted language from product literature associated with Raritan's CommandCenter™ to argue that the patent claims are anticipated by this prior art. Souri Decl. ¶¶ 35–38; '152 Patent Claim Chart Comparison to CommandCenter™ (Souri Decl., Ex. B; Dkt. No. 32-24); '682 Patent Claim Chart Comparison to CommandCenter™ (Souri Decl., Ex. C; Dkt. No. 32-25).

Avocent undermines ZPE's "patch-work-quilt argument" by maintaining that "ZPE's reliance on no less than eight different brochures, manuals, slide presentations, and press releases, from a variety of different sources and published over a number of different years, cannot be anticipatory." Reply ISO PI at 9. It asserts that the materials describe different versions of Raritan's CommandCenter™, or have no apparent relationship to the CommandCenter at all. Reply ISO PI at 9–11; Supp. McAlexander Decl. ¶¶ 7–11.

In order for prior art to anticipate a claim under 35 U.S.C. § 102, "a single prior art reference must expressly or inherently disclose each claim limitation." *Finisar Corp.*, 523 F.3d at 1334. Avocent raises several questions about the various publications and whether they describe a single version of Raritan's CommandCenter™ that meets each of the claim limitations of its asserted patents. But I am not convinced that ZPE's anticipation defense "lacks substantial merit." *Titan Tire*, 566 F.3d at 1377. As Dr. Souri indicated in his comparison charts, "[d]iscovery is highly likely reveal [sic] similar publications relating to the prior art CommandCenter having different publication dates and/or different versions that will also qualify as prior art." '152 Patent Claim Chart Comparison to CommandCenter™ at 1 n.3. Dr. Souri's charts are at least enough to

raise a "substantial question" of whether a single prior art reference discloses each of the claim limitations in Avocent's patents. *See Titan Tire*, 566 F.3d at 1378 ("If the trial court determines that the challenger's evidence is sufficient to raise 'a substantial question' of invalidity, the trial court must then afford the patentee the opportunity to show that the invalidity defense 'lacks substantial merit.'"). And Avocent never addressed ZPE's contention that Avocent failed to disclose this prior art during patent prosecution, which also undercuts the presumption of validity. *See* Mot. for PI at 12 (relying on PTO's consideration of the prior art references and decision to "ultimately allow[] the patent, in part because, such in-band prior art systems did not provide the benefits of the claimed consolidated out-of-band management systems, which permit network managers to remotely access and control various nodes on a network when the node is disconnected from the network or the in-band network fails.").

The unsettled questions surrounding the scope of the claim terms and the potentially anticipatory prior art reference seriously impair Avocent's ability to demonstrate that it is likely to succeed on the merits of this action. That said, I need not but will address the remaining factors to further demonstrate that a preliminary injunction is not warranted here.

**B.      Irreparable Harm if an Injunction is Not Granted**

A plaintiff seeking a preliminary injunction "must make a clear showing that it is at risk of irreparable harm, which entails showing a likelihood of substantial and immediate irreparable injury." *Apple Inc. v. Samsung Electronics Co., Ltd.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012). As a general rule, plaintiffs seeking injunctive relief must demonstrate that "remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). In cases where an "accused product includes many features of which only one (or a small minority) infringe[,]" the risk of irreparable harm alone is not enough. "Rather, the patentee must also establish that the harm is sufficiently related to the infringement." *Apple*, 695 F.3d at 1374.

Avocent asserts that it has already suffered and will continue to suffer irreparable harm because ZPE has pilfered Avocent's customers with its allegedly infringing NodeGrid Serial Console products. PI Mot. at 13–16. In addition, ZPE's alleged infringement jeopardizes

Avocent's long-standing customer relationships, its market share, and its reputation in the industry. Wirts Decl. ¶¶ 18–21. Avocent urges that this harm is irreparable because, once it loses contracts, it loses the necessary insight to meet the ongoing needs of those customers. And once a customer begins using another product, employees become familiar with that product making it less likely that a customer will change suppliers in the future. Wirts Decl. ¶ 19. This loss leads to loss of sales related to other products, such as Avocent's power distribution units (PDUs) and uninterruptable power supplier (UPSs). Wirts Decl. ¶ 20.

Avocent is correct that these types of losses may constitute irreparable injury. "Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm." *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012). But ZPE contends that Avocent's arguments fail for two reasons: first, it delayed filing its motion for two and one-half years, and second, it cannot establish a causal relationship between the alleged harm and alleged infringement. Opp'n to PI at 3. I find merit in both of these contentions.

ZPE insists that Avocent's delay "refutes irreparable harm." Opp'n to PI at 3. According to ZPE, Avocent's own representations indicate that it knew of ZPE's product line in 2015,[11] Corrected Wirts Decl. ¶ 5, learned of ZPE's sales in 2016, *id*. ¶ 9, and accounted for its own lost sales in late 2016 and early 2017, *id*. ¶ 7. Despite this knowledge of ZPE's products as far back as 2015, Avocent did not file its complaint until July 2017, and did not file this motion until August 2017. Avocent attempts to rebut the assertion of delay by insisting that it filed this lawsuit shortly after learning that it lost a second account to ZPE's Nodegrid product. Wirts Decl. ¶¶ 7, 11, 14–16; Supp. Wirts Decl. ¶ 7.

[11] As noted in the background section, the parties dispute the contents of the April 2015 teleconference between the parties. *See supra* background footnote 6. According to ZPE, Avocent learned at this time that ZPE was discussing the Nodegrid Serial Console with Google. *Id*. It never mentioned "any purported intellectual property, or that it considered any ZPE product to infringe on any purported Avocent technology." *Id*. ¶ 21. Avocent contests the accuracy of Zimmerman's representations. *See* Reply ISO PI at 1; Supp. Wirts Decl. ¶¶ 2–5. According to Wirts, Avocent did not ask ZPE to consider supplying its NodeGrid Serial Console product on an OEM basis. Supp. Wirts Decl. ¶ 5. To the contrary, Avocent lacked sufficient information about the product, and therefore "was in no position to suggest out-sourcing production of that product from ZPE." *Id*.

It may have been reasonable for Avocent to wait to file its motion for preliminary injunction until after it lost a second sale to ZPE, since the damage flowing from lost sales may justify a finding of irreparable harm, *see supra* discussion, but did the 2015 conversation trigger some sort of duty to investigate potential infringement by ZPE's product? *See, e.g.*, *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995)("Absent a good explanation, not offered or found here, 17 months is a substantial period of delay that militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief."); *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985)("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm.").  Avocent insists that the 2015 conversation did not provide sufficient information to adequately assess ZPE's Nodegrid Serial Console.  Supp. Wirts Decl. ¶ 5; *see supra* notes 6, 11.  Even if I accept Avocent's representations, the time frame raises questions regarding when Avocent should have investigated potential infringement by ZPE's product, and perhaps more importantly, whether the infringement itself caused the claimed irreparable harm.

"To show irreparable harm, it is necessary to show that the infringement caused harm in the first place."  *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012).  According to the Federal Circuit,

> Sales lost to an infringing product cannot irreparably harm a patentee if consumers buy that product for reasons other than the patented feature. If the patented feature does not drive the demand for the product, sales would be lost even if the offending feature were absent from the accused product.

*Id.*  ZPE contends that Avocent's allegations "fall[] far short of establishing a causal nexus[.]"  Opp'n to PI at 5.  It states that the NodeGrid product is ███████████ than competing ACS products and it would not make sense for customers to pay a premium for a product with identical features.  *Id.*  It suggests that Avocent has not significantly improved its product since it was released in 2006, Zimmerman Decl. ¶ 6, whereas customers are "interested in ZPE's new technology and new features, including but not limited to its higher speed and power, high density port count, its heightened security, its Zero Touch Provisioning technology, and its ability to be

easily customized." Zimmerman Decl. ¶ 30. In addition, it points to evidence that Avocent lost the Facebook and Google sales for reasons unrelated to the alleged infringement. Opp'n to PI at 6 (Dkt. No. 31-4[under seal]); Zimmerman Decl. ¶¶ 24–26, 28 (Dkt. No. 31-6[under seal]).

ZPE also highlights that Avocent's sales began decreasing "long before" the time the NodeGrid product entered the market. Opp'n to PI at 6 (citing Emerson's Form 10-Qs for 2011, 2012, 2013, and 2015)(Whitman Decl. ¶¶ 2–5; Dkt. Nos. 32-2, 32-3, 32-4, 32-5). The 2010 report indicates that "Network Power earnings also decreased, reflecting volume deleverage in the embedded computing and power business due to computing and power business due to customer supply chain disruptions, and volume decrease related to weakness in telecommunications and information technology markets." Emerson's Form 10-Q for quarter ending December 2011 (Dkt. No. 32-2).

Avocent takes great issue with ZPE's characterization of its sales and market share. *See* Supp. Wirts Decl. ¶¶ 10–11. It indicates that sales of its ACS product trended up between 2012 and 2016. *Id.* ¶¶ 9, 11. And it insists that the losses it has sustained would not have occurred if ZPE's products "did not facilitate out-of-band management and connect through multiple different interfaces… ." *Id.* ¶ 8. In Avocent's estimation, this is sufficient to establish the causal nexus between infringement and irreparable harm. Reply to PI at 2; *see Apple*, 678 F.3d at 1324 ("If the patented feature does not drive the demand for the product, sales would be lost even if the offending feature were absent from the accused product.").

Given the competing evidence submitted by ZPE that Avocent lost the Facebook and Visa accounts to the ▮▮▮▮▮▮▮ Nodegrid Serial Console[TM] for reasons unrelated to the product's purported infringement, *see* Zimmerman Decl. ¶¶ 24–26 (Dkt. No. 31-6[under seal]), Avocent has not "clearly show[n]" that ZPE's alleged infringement was responsible for Avocent's lost sales. *See Apple*, 678 F.3d at 1324 ("Weighing the evidence, the district court concluded that it did not clearly show that Samsung's allegedly infringing design was responsible for Apple's lost sales; at most, it showed that the alleged infringement caused an insignificant amount of lost sales."). Avocent has failed to establish the requisite causal nexus. *See Finjan, Inc. v. Blue Coat Sys., LLC*, No. 15-CV-03295-BLF, 2016 WL 6873541, at *8 (N.D. Cal. Nov. 22, 2016)(finding no causal

nexus because "Finjan points to no customer surveys, market evidence, or admissions from Blue Coat regarding the relationship of [the accused component] to customer demand.").

### C.     Balance of Hardships

Avocent contends that the balance of hardships "strongly favors" it because "[t]he preliminary injunction … is narrowly tailored to address just the infringing NodeGrid Serial Console products[.]"  PI Mot. at 16.  ZPE counters that its NodeGrid Serial Console is responsible for about ███████████████████████ would cause significant harm, including ████████████████████████.  Zimmerman Decl. ¶ 31 (Dkt. No. 31-6[under seal]).  In addition, ██████████████████████████████.  *Id*.

"A party cannot escape an injunction simply because it is smaller than the patentee or because its primary product is an infringing one."  *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1156 (Fed. Cir. 2011).  The Federal Circuit has indicated that an alleged infringer "cannot justify denial of [an] injunction" on grounds that the accused product is its primary product and injunction might put it out of business.  *Windsurfing Int'l Inc. v. AMF, Inc.,* 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986).  The *Windsurfing International* court explained that "[o]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."  *Id.*  On the other hand, the Federal Circuit has also acknowledged that "[t]he hardship on a preliminarily enjoined manufacturer who must withdraw its product from the market before trial can be devastating."  *Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683 (Fed. Cir. 1990).  Ultimately, an appropriate balance of potential hardships must consider the patentee's showing on likelihood of success and irreparable harm.  *Id*.  Given the shortcomings in Avocent's ability to establish the first two factors, the balance of hardships tips in ZPE's favor.

### D.     The Public Interest

"Typically, in a patent infringement case, although there exists a public interest in protecting rights secured by valid patents, the focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of

United States District Court
Northern District of California

preliminary relief." *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1458 (Fed. Cir. 1988). ZPE maintains that granting an injunction under these circumstances "would be a disservice to the public" because it would deprive the public of ZPE's NodeGrid Serial Console, which provides "new and innovative features that no one else offers." Opp'n to PI at 25. Courts have recognized a company's legitimate right to compete, especially at this stage of the litigation. *See, e.g.*, *Illinois Tool Works*, 906 F.2d at 684 (affirming the district court's denial of a preliminary injunction when it "deemed [the public's interest in the protection of patent rights] counterbalanced in this case by Grip–Pak's continuing right to compete, which must be seen as legitimate at this motion stage in view of ITW's 'remote' showing of likelihood of success in proving infringement at trial."); *Finjan, Inc. v. Blue Coat Sys., LLC*, No. 15-CV-03295-BLF, 2016 WL 6873541, at *9 (N.D. Cal. Nov. 22, 2016)("[I]t seems likely that granting an injunction here could work a small disservice to the public because it would deprive the public of DRTR's real-time content analysis services, a technology that Blue Coat offers but Finjan does not.").

Given the substantial questions surrounding the validity of the patents, Avocent has failed to make a clear showing that it is likely to succeed on the merits. Nor has it sufficiently established the requisite causal nexus between ZPE's alleged infringement and Avocent's irreparable injury. These factors tip in ZPE's favor and outweigh the remaining two factors, which are neutral at best. Avocent's motion for a preliminary injunction is DENIED.

I will now address the last remaining issue, ZPE's challenge to the infringement allegations in Avocent's amended complaint.

## III. INFRINGEMENT ALLEGATIONS

### A. Direct Infringement

ZPE argues that Avocent's direct infringement claims must fail because Avocent has repeatedly failed to identify "network nodes manageable through a dedicated management interface other than through the data transmission interfaces." Mot. to Dismiss First Am. Compl. at 4 ("MTD FAC")(Dkt. No. 51); *see* '152 Patent, claim 1, at 15:14-17; *id.*, claim 11, at 16:53-56; '682 Patent, claim 1, at 15:17-19. It insists that these systems no longer exist due to technological improvements in simple network management protocol (SNMP) over the internet (or "in-band"),

1    which have eradicated the security concerns associated with pre-2004 network nodes.  MTD FAC

2    at 8.  As a result, network nodes today have dual access management, which enable management

3    through their data interfaces *and* through their management interfaces.  It contends that Avocent

4    has repeatedly ignored this claim limitation by alleging that network nodes *communicate* multiple

5    types of management data using an out-of-band management interface.  But it urges that network

6    nodes' ability to communicate data is not the same as network nodes that are "*manageable*

7    through a dedicated management interface other than through the data transmission interfaces."  It

8    also underscores that Avocent's complaint does not allege that the network nodes receive and

9    transmit management data; rather, the FAC alleges only that the nodes transmit data.

10    In opposition, Avocent argues that "network nodes" receive "management data" through a

11    "dedicated management interface," which is equivalent to the claim that the network nodes are

12    manageable through the dedicated management interface.  Opp'n to MTD FAC at 4 (Dkt. No. 53).

13    It contends that ZPE's attack on this claim limitation is a veiled summary judgment challenge that

14    ignores the plausibility standard applicable when assessing a motion to dismiss.  *Id*. at 2–5.

15    At this stage of the litigation, I disagree with ZPE that "manageable" cannot mean

16    "transmitting and receiving management data."  It may be that claim construction and summary

17    judgment ultimately validate ZPE's position, but it is too soon to tell.  ZPE correctly notes,

18    however, that the FAC does not actually include allegations that the network nodes "receive"

19    management data; it only alleges that they transmit data, which is not the same thing as receiving

20    it.  *See* FAC ¶¶ 20, 47, 48.  During the hearing on this motion, Avocent acknowledged this

21    oversight and represented that "[w]e could amend to allege to and from."  1/24/18 Hr'g Tr. at 9:10

22    (Dkt. No. 71).  Avocent also emphasized that it had provided amended infringement contentions in

23    an attempt to clearly articulate how each of the claim limitations are met, including the one at

24    issue here.  *See id.* at 9:19–10:14.  Under these circumstances, I will accept Avocent's on-record

25    representations.  I see no need to require Avocent to file an amended complaint to "rephrase" its

26    allegations to comport with the parties' understanding since part of the purpose of the complaint is

27    to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests[.]"

28    *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

ZPE also insists that the direct infringement allegations fail to state a plausible claim for relief because the out-of-band network nodes must be "manageable through a dedicated management interface *other than through the data transmission interfaces*." '152 Patent, claim 1, at 15:14-17 (emphasis added); *see also id.*, claim 11, at 16:53-56; '682 Patent, claim 1, at 15:17-19; *see* MTD FAC at 7. According to ZPE, this claim limitation explicitly excludes network nodes that are manageable over the internet through their data/Ethernet interfaces, or "in-band" network nodes. MTD FAC at 7. And it contends that this position is bolstered by the specification's disclaimer of network nodes that provide a second point of access to the managed devices. *Id.*; *see* '152 Patent at 6:15-17 ("The invention provides a single secure point of access to the managed devices 30… ."). ZPE maintains that this type of single access network node no longer exists, which further supports dismissal of Avocent's complaint. *See* MTD FAC at 10 ("Today, network nodes have dual access management and can be directly managed through their data interfaces, in direct contravention of every claim and the specification's express disavowal of such devices.").

But Avocent has alleged that these network nodes exist, and that ZPE's product is used with these devices to infringe Avocent's patent claims. Opp'n to MTD at 4–6. According to the FAC,

> [E]ach of the NodeGrid-brand products are out-of-band management products. In use, each of the NodeGrid-brand products communicate with a group of network devices (e.g., routers, firewalls, PDUs, etc.) (i.e., the claimed "network nodes"), where at least two of the group of network devices communicate through a dedicated management interface (e.g., a serial port or a set of KVM ports) using multiple types of management interfaces (e.g., IPMI, iLO, UPS, RS-232) to communicate multiple types of management data (e.g., KVM, command line, etc.) to the NodeGrid-brand products using an out-of-band management interface, not a substantive data transmission interface (e.g., a substantive data Ethernet-LAN interface).

FAC ¶ 20. Avocent insists that discovery will confirm that "[t]he firewalls, routers, PDUs, servers, etc. that are being sold today have dedicated management interfaces that allow both ZPE's accused products and Avocent's patented products to manage those devices using those interfaces." Opp'n to MTD FAC at 6.

It also insists that "the specifications of the patents-in-suit teach that use of the Internet and

29

Ethernet is within the scope of the invention." *Id.* at 8. Specifically, it points to the specifications'

description of figure 1, in which

> The management data from the managed devices is then sent over a communications network **26**, such as the Internet, wide area network, local area network, any combination of these networks or any other communications network, to a network management system **28** or a network management workstation **29** whose operation, features and functions are well known.

'152 Patent at 5:30–36. This language describes the "typical system" of the prior art, which the

specification clearly distinguishes from the "invention": "[a]n out-of-band network management

system ... that overcomes these limitations of typical systems[.]" *Id.* at 5:36–63. Avocent is

correct, however, in urging "there is no basis for ZPE to argue that so-called 'Ethernet interfaces'

are excluded from the invention or the claims." Opp'n to MTD FAC at 8. The specification

provides, "[i]n accordance with the invention, the universal connectivity module **44** may convert

management application/module instructions ... into device specific instructions which may be

transported over Ethernet... ." '152 Patent at 11:5–10.

In short, ZPE's assertions that (1) "manageable" cannot mean receiving and transmitting

data, (2) the claimed network nodes no longer exist, and (3) the data transmission cannot occur

over Ethernet are premature attacks that have no bearing on Avocent's ability to plausibly state a

claim of direct infringement. ZPE's arguments may prove meritorious with a more substantive

record but they fail to identify deficiencies that justify dismissing Avocent's complaint.

*See, e.g.*, *Windy City Innovations, LLC v. Microsoft Corp.*, Case No. 16-cv-01729-YGR, 193 F.

Supp. 3d 1109, 1115 (N.D. Cal. 2016)("The Complaint here is not so riddled with such

deficiencies. To the contrary, the Complaint describes (i) the Accused Instrumentalities and the

functionalities of those products which allegedly infringe on plaintiff's patents and (ii) the ways in

which the Accused Instrumentalities meet claims of the Patents.").

### B.  Indirect Infringement

ZPE contends that Avocent's indirect infringement claims must fail because it has not

plausibly alleged direct infringement. MTD FAC at 11; *see In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1333 (Fed. Cir. 2012)("It is axiomatic that 'there can

be no inducement or contributory infringement without an underlying act of direct infringement.'")(alterations omitted). In the alternative, it insists that the claims must fail because Avocent has insufficiently pleaded that it had pre-suit knowledge of the asserted patents, that it possessed a specific intent to induce infringement, and that its products have no substantial non-infringing uses. Having concluded that Avocent plausibly pleaded claims for direct infringement, I will address ZPE's alternative arguments for dismissing Avocent's indirect infringement claims.

### 1. Induced Infringement

Under the Patent Act, whoever actively induces infringement of a patent is liable as an infringer. 35 U.S.C. § 271(b). "Inducement requires a showing that the alleged inducer knew of the patent, knowingly induced the infringing acts, and possessed a specific intent to encourage another's infringement of the patent." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1328 (Fed. Cir. 2009). ZPE insists that Avocent's allegations are insufficient because (1) the fact that Avocent's former employees now work for ZPE does not demonstrate pre-suit knowledge of the patents, and (2) the existence of instruction manuals is an insufficient basis for finding an intent to encourage its customer's to infringe Avocent's patents. MTD FAC at 12.

ZPE's arguments fall short. It is true that the general involvement of employees in the "design, development, marketing, sales, and patenting" of other technology is not the same as alleging those employees had actual knowledge of the patents-in-suit. *See, e.g.*, *Finjan, Inc. v. Cisco Systems Inc.*, 17–CV–00072-BLF, 2017 WL 2462423, at *5 (N.D. Cal. June 7, 2017) ("[T]he FAC never ties this general knowledge of [plaintiff's] patent portfolio to the Asserted Patents, nor makes any factual allegations that [defendant] specifically learned of the Asserted Patents. Knowledge of a patent portfolio generally is not the same thing as knowledge of a specific patent."); *OpenTV, Inc. v. Apple, Inc.*, 14–CV–01622-HSG, 2015 WL 1535328, at *7 (N.D. Cal. April 6, 2015) ("The Court cannot infer knowledge of particular patents from knowledge of the existence of a company's *entire portfolio* of patents") (emphasis in original). But Avocent alleges more than that its former employees work for ZPE; it states that "a number of the principals of Defendant were previously employed by Avocent, were involved in the design, development, and patenting of Avocent technology related to DCIM [Data Center Infrastructure Management] and

remote management products."  FAC ¶ 22; *see also id.* ¶¶ 29, 38 (alleging that ZPE employees "previously employed by Avocent, were involved in the design, development, marketing, sales, and patenting of Avocent technology related to DCIM and remote management products."); *id.* ¶¶ 50, 57, 66 (alleging similar facts related to the '152 patent).  In other words, Avocent alleges that specific former employees, including ZPE's principals, worked in the particular department that designed and developed the specific technology employed in the accused product.  This is sufficient to clear the plausibility hurdle with respect to pre-suit knowledge of the asserted patents. *See In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1341 (Fed. Cir. 2012)("As the Supreme Court has explained, the plausibility requirement is not akin to a 'probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged.")(alterations omitted).

As for the second element of inducement, ZPE argues that Avocent fails to "cite a single instruction (or anything else) that tracks any claim's elements such that there would be a basis to infer that ZPE specifically intended for its customers to infringe."  MTD FAC at 13.  But Avocent need not make such a showing at this stage.  It insists that ZPE's acts of providing its products with instruction manuals and other product literature "with the intent that those third-party customers establish systems that directly infringe" is sufficient to establish ZPE's specific intent. FAC ¶ 28 ('682 patent); *id.* ¶ 56 ('152 patent); *see* Opp'n to MTD FAC at 12.  In other words, Avocent alleges that ZPE sells its NodeGrid Serial Console with the specific intent that its customers use the product in a system that infringes Avocent's patents.  These allegations are sufficient to allow a reasonable inference that ZPE is liable for induced infringement.  *See, e.g.*, *Commil USA, LLC v. Cisco Sys., Inc.*, ___ U.S. ___, 135 S. Ct. 1920, 1928 (2015)("That language [of section 271(b)] requires intent to 'bring about the desired result,' which is infringement."); *In re Bill of Lading*, 681 F.3d at 1341–42 ("Common sense indicates that advertising that your product can be used in conjunction with dispatch software to improve asset utilization and provide operational efficiency to the less-than-a-load shipping/trucking industry gives rise to a reasonable inference that you intend to induce your customers to accomplish these benefits through utilization

of the patented method. This is sufficient to push the complaint past the line 'between possibility and plausibility.'"); *Regents of Univ. of California v. Boston Sci. Corp.*, No. 16-CV-06266-YGR, 2017 WL 2335543, at *3 (N.D. Cal. May 30, 2017)("The Complaint alleges seminars, tradeshows, marketing materials, and training programs used by BSC to promote the use of BSC devices to practice the Patented Method. [citation] These allegations are sufficient to allege the basis for the claim of induced infringement of the alleged patents… .").

### 2.     Contributory Infringement

A claim of contributory infringement requires a predicate act of direct infringement, and allegations "that defendant knew that the combination for which its components were especially made was both patented and infringing and that defendant's components have no substantial non-infringing uses." *Cross Med. Prod., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1312 (Fed. Cir. 2005)(internal quotation marks omitted).  ZPE argues that Avocent's allegations that ZPE's "products are not staple articles of commerce that have no substantial non-infringing uses" are "threadbare, unsupported, conclusory allegations" that are insufficient to state a claim.  MTD FAC at 14–15 (quoting FAC ¶¶ 12, 37, 39, 42, 65, 67, 70).  Even ignoring the FAC's deficiencies, ZPE points out that its products necessarily have substantial non-infringing uses because they are capable of in-band operation, which Avocent's patents expressly disclaim.  MTD FAC at 15; *see, e.g.*, '152 patent, claim 1 at 15:15–17 (claiming "network nodes manageable through a dedicated management interface *other than through the data transmission interfaces*")(emphasis added).

In response, Avocent highlights its allegations that "ZPE's customers would not purchase the NodeGrid-brand products if those products did not have out-of-band management features and capabilities."  FAC ¶¶ 41, 65.  It insists that this must be true because customers do not need special equipment for in-band management, so they "purchase the NodeGrid-brand products specifically for the purpose of using their out-of-band management features and capabilities."  *Id.*; *see also* Opp'n To MTD FAC at 13–14.  But these allegations do not refute ZPE's contentions that its products offer substantial non-infringing uses.  As ZPE points out, Avocent's deflection seems to concede that ZPE's products do have substantial non-infringing uses.

"In the context of a claim of contributory infringement under § 271(c), a substantial non-

infringing use is any use that is 'not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.'" *In re Bill of Lading*, 681 F.3d at 1337. *In re Bill of Lading* is instructive. The Federal Circuit affirmed the district court's dismissal of plaintiff's contributory infringement allegations, not because they "lacked sufficient detail to satisfy the specificity requirement of *Twombly* and *Iqbal*[,]" but "because the facts alleged demonstrated that the [accused] products *do* have substantial non-infringing uses." *Id.* (emphasis in original). The court rejected the plaintiff's allegations because they "sa[id] nothing more than 'if you use this device to perform the patented method, the device will infringe and has no noninfringing uses.'" *Id.* at 1338. "Where the product is equally capable of, and interchangeably capable of both infringing and substantial non-infringing uses, a claim for contributory infringement does not lie." *Id.* That holding controls here. Avocent admits that ZPE's product is capable of in-band use, which would not lead to a viable claim of infringement. Opp'n to MTD FAC at 14–15 ("The accused ZPE products provide, as they must, both in-band and out-of-band management."). It simply insists that ZPE's customers would not purchase its products for in-band use only, "[b]ut that is not the relevant inquiry." *In re Bill of Lading*, 681 F.3d at 1338; *see also id.* at 1339 ("That practicing the patented method may be the most logical or useful purpose for [the accused] products does not render the alternative uses 'unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.'").

Accordingly, Avocent's claims for contributory infringement are DISMISSED WITHOUT LEAVE TO AMEND.[12]

## C.     Willful Infringement

ZPE argues that Avocent's willful infringement claims are insufficient for lack of pre-suit

---

[12] Avocent does not directly argue that claim construction is a necessary prerequisite to a finding of no substantial non-infringing uses, but it alludes to such when it references ZPE's argument that the claims require "network nodes manageable through a dedicated management interface other than through the data transmission interfaces." *See* Opp'n to MTD FAC at 14. While claim construction will impact the success of Avocent's direct infringement allegations, it will not affect the analysis of substantial non-infringing uses. As in *In re Bill of Lading*, "formal claim construction is not required to reach the conclusion that each Amended Complaint affirmatively establishes that Appellees' products can be used for non-infringing purposes." 681 F.3d at 1339.

knowledge of the patents and a complete absence of any allegations of egregiousness.

"Knowledge of the patent alleged to be willfully infringed continues to be a prerequisite to enhanced damages." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016). As discussed in the induced infringement analysis, Avocent's allegations plausibly allege ZPE's pre-suit knowledge of the patents in suit. *See supra* discussion. As for egregiousness, Avocent highlights the alleged actions of its former employees—they left to form ZPE and directly compete with it, they hold leadership positions at ZPE, they were involved in the development of its DCIM and remote management products, they had access to its confidential and proprietary information and trade secrets, they had signed Avocent's nondisclosure agreements, and they used that information to target Avocent's customers. FAC ¶¶ 2-7; *see* Opp'n at 15–16.

Avocent relies on *Nanosys, Inc., et al. v. QD Vision, Inc.*, No. 16-CV-01957-YGR, 2017 WL 35511 (N.D. Cal. 2017) to support its case for willful infringement when former employees start a new company with the intent to compete using knowledge of the former company's technology. The *Nanosys* court denied defendant's motion to dismiss willful infringement claims because "[p]laintiffs have alleged that the former founder of Nanosys who is also named as an inventor of the patents at issue used his specific knowledge regarding such patents to develop competing technology at another company." 2017 WL 35511, at *1.

As ZPE points out, a difference between *Nanosys* and this case is that none of the individuals identified as Avocent's former employees are the named inventor of Avocent's patents. *See* Reply ISO MTD FAC at 15. But I am not convinced that this distinguishing fact negates any allegations of egregiousness sufficient to find willful infringement here. If ZPE's principals used their specific knowledge of Avocent's patents to develop competing technology, even though they were not named inventors of those patents, that conduct could be sufficiently egregious to support a finding of willful infringement. *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016)("The sort of conduct warranting enhanced damages has been variously described in our cases as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate.").

**CONCLUSION**

In accordance with the foregoing, the motions are adjudicated as follows:

ZPE's motion to dismiss on grounds that the patents claim ineligible subject matter under 35 U.S.C. § 101 is DENIED.

Avocent's motion for preliminary injunction is DENIED.

ZPE's motion to dismiss the first amended complaint is GRANTED IN PART AND DENIED IN PART; Avocent's contributory infringement claims are DISMISSED WITHOUT LEAVE TO AMEND.

**IT IS SO ORDERED.**

Dated: March 21, 2018

William H. Orrick
United States District Judge